UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Yvonne Spicer,

        Plaintiff,

v.                                                          Civ. No. 05-194 (JNE/SRN)
                                                                    ORDER

Hartford Life and Accident
Insurance Company,

        Defendant.

---

Daniel Zeddies, Esq., Daniel Zeddies Professional Association, appeared for Plaintiff Yvonne Spicer.

Eric Tostrud, Esq., Lockridge Grindal Nauen P.L.L.P., appeared for Defendant Hartford Life and Accident Insurance Company.

---

Yvonne Spicer brought this action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (2000), against Hartford Life and Accident Insurance Company (Hartford) to recover long-term disability (LTD) benefits under a plan offered by her former employer, North Memorial Health Care (North Memorial). The case is before the Court on Spicer's Motion for Summary Judgment and Hartford's Motion for Summary Judgment. For the reasons set forth below, the Court denies Spicer's motion and grants Hartford's motion.

## I.    BACKGROUND

Spicer started to work at North Memorial in August 1994. From July 1995 to April 2001, she was a clinic business office specialist. A Position Description describes the purpose of Spicer's position as: "To coordinate the entry of medical information into appropriate screens in the electronic medical record in an accurate, timely and systematic manner to ensure a high quality medical record."

During her employment, Spicer became insured under a group insurance policy (Policy) issued by Hartford to North Memorial. The Policy defines "disability" and "disabled":

> **Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by
>
> . . . .
>
> 2.  sickness;
>
> . . . .
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

The Policy defines "Essential Duty":

> **Essential Duty** means a duty that:
>
> 1.  is substantial, not incidental;
>
> 2.  is fundamental or inherent to the occupation; and
>
> 3.  can not be reasonably omitted or changed.
>
> To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty.

"Any Occupation" means "an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance."

On April 21, 2001, Spicer had a stroke that impaired her ability to see to her left. After her stroke, Spicer made a claim for LTD benefits under the Policy. Hartford approved Spicer's application for LTD benefits from July 21, 2001, the expiration of the three-month elimination period, to August 12, 2001, the day before Spicer returned to work at North Memorial. Spicer's

2

return to North memorial lasted less than six months. Hartford reinstated her LTD benefits effective February 4, 2002.

By letter dated July 24, 2003, Hartford informed Spicer that she had reached the end of her first twenty-four months of eligibility for LTD benefits, that it was gathering additional information about her disability status, and that it would continue to pay benefits during its review. Approximately six months later, Hartford informed Spicer that it had determined she no longer met the Policy's definition of Disability and that it would not pay LTD benefits after January 31, 2004. Spicer appealed Hartford's decision to terminate her LTD benefits. On December 3, 2004, Hartford informed Spicer that it had completed its review of her appeal, that it had determined she did not meet the definition of Disability applicable as of July 21, 2003, and that it would not pay further benefits to her. After receiving Hartford's final decision, Spicer brought this action.

The administrative record on which Hartford based its decision to terminate Spicer's benefits reveals that Spicer experienced a right occipital infarction on April 21, 2001. The stroke impaired Spicer's ability to see to her left. She was diagnosed with left quadrantanopia. As part of Spicer's initial application for LTD benefits, one of her physicians, Dr. Natalie Retamoza, described Spicer's visual impairment as "permanent—but can be compensated for with time and therapy." Dr. Retamoza also referred Spicer to a neurologist, Dr. Bruce Mack.

By letter of February 21, 2002, to Dr. Retamoza, Dr. Mack summarized his examination of Spicer:

> Ms. Spicer continues to have problems with her vision and describes a diagonal partial left field cut which slopes downward and inward from the left temporal area. While she can see the extreme periphery, she loses the object as it enters her field of vision and then it reappears as it become [sic] more central in the vision. Consequently she has had a lot of difficulties. She had to stop working at the medical business office where she was a specialist because she had a lot of trouble

3

with visual distractions. She could not function speedily. For a while she was at the North Memorial emergency room doing coding but after one month she stopped as both she and the employer agreed that she could not manage the work. They did their best to help her, she recalls, but she had a lot of problems with doing things in sequence. Part of this was intellectual and part of this was transposition of numbers. She is now being referred to the Courage Center for an occupational evaluation regarding her interest and ability. She says that her reading is pretty good although noting the partial field cut. She has trouble in grocery stores or anywhere where there is a lot of activity or distracting visual stimuli. She then feels dizzy and her daughter has noted that she may lean to the right. She says she pauses to let her brain catch up. . . .

. . . .

Ms. Spicer has had an occipital infarction and has residual visual field cut as well as problems with sequential visual and other sequential tasks. I believe this is a permanent deficit. It may be difficult or impossible to find a job for her that will utilize her previous skills as many of these were dependent on visual intactness. If she and her evaluators do not feel that there is a job where she can be gainfully and appropriately employed, I would be glad to support any efforts that she might make to acquire a disability status.

As indicated by Dr. Mack, the Courage Center conducted a vocational evaluation of Spicer in early March 2002. The evaluation sought to "assist in determining vocational options available to Ms. Spicer based on her current skills, cognitive processing, physical endurance, and employment options available within the North Memorial health care system." With regard to Spicer's fatigue and visual impairment, the evaluation noted:

Ms. Spicer was observed performing more effectively in the morning when she was refreshed. As the day progressed, she was noted to slow slightly in mental processing, and work speed. She would benefit from working part time due to the fatigue issues that she experiences. Difficulty with attending to multiple activities was observed to be a slight problem in the afternoon.

Ms. Spicer was able to tune out some of the distractions that were typical in an office environment. She did have difficult [sic] with tuning out loud noises during the evaluation.

Ms. Spicer was observed compensating very well for her left field cut. She has received therapy on how to compensate for the field cut issues and was observed implementing the strategies during the evaluation (ruler used and with her every day, moved paper and copy holders). Scanned visual material that was in front of her. She did report that she continues to have problems with missing

4

information that is a document on the screen. It sounded like this was more cognitive than having to do with the field cut.

After noting that Spicer "displayed some impressive transferable skills," the evaluation listed positions for her to consider. The evaluation concluded that Spicer "would be strongly encouraged to work part time at this time due to the physical and cognitive fatigue she was observed experiencing," and that she may want to consider working four hours per day to start and slowly increasing her hours as appropriate.

In a May 2002 Attending Physician's Statement, Dr. Retamoza stated that Spicer had "vision disturbances" and "difficulties processing & interpreting new information." Dr. Retamoza described Spicer's visual impairment as homonomous hemianopia. Dr. Retamoza also stated that Spicer's ability to drive was limited to local, familiar environments and that Spicer's ability to learn new skills was limited. Two months later, Spicer reported to Hartford that her "visual field cut makes bright colors hard to deal with," that she had "trouble with learning new projects," and that she was "unable to take notes" due to her inability to "process information quickly enough."

On September 16, 2002, the Social Security Administration denied Spicer's claim for disability benefits. As part of her appeal, Spicer obtained letters from Dr. Mack and her new physician, Dr. Dennis Showalter. On October 16, 2002, Dr. Mack wrote:

> [Spicer's] right occipital infarction has produced a persistent visual difficulty to her left. She continues to have problems with reading. After a short time, she begins to lose the line and as a result has to hold a ruler to guide her eyes. She has problems in stores and has difficulty finding items on shelves. Visual input is confusing, and causes her to experience headache and imbalance when she is in a busy place. Computer skills are impaired because she cannot perform the quick visual tasks to which she was accustomed. She also has difficulty writing things as fast as previously. . . .
>
> Because of Ms. Spicer's right occipital infarction, she is unable to perform complex visual tasks. Consequently, she cannot do keyboard work or reading, and this adversely affects essentially every employment for which she might be

5

capable. It is my opinion that she is disabled, and I hope this letter will help her to qualify for social security disability.

By letter of November 13, 2002, Dr. Showalter stated:

> [Spicer] suffered a right occipital infarction, which has caused a visual defect on the left. Specifically, it has caused a left-sided quadrantanopsia. This is a visual defect involving both eyes secondary to the stroke in her brain. This causes a variability in vision, especially with looking towards the left. She can see peripherally somewhat, however, loses vision in an area in the mid periphery then regains vision centrally. This causes significant problems with sequential visual and other sequential tasks. It causes dizziness and lightheadedness as well as headaches. She is unable to read for any length of time secondary to being unable to follow the line. She's unable to do keyboard tasks because of the visual skills needed for this. It was in the opinion of Dr. Bruce Mack from the Minneapolis Clinic of Neurology that this is a permanent disability. He felt that she was disabled because of the above mentioned for essentially every employment which she might be capable.

In a Claimant Questionnaire dated January 23, 2003, Spicer told Hartford she found it difficult to read, to look at computer screens, and to walk in crowded areas. She worked on compensating for her visual impairment by, for example, wearing sunglasses in crowded stores. She occasionally transposed numbers when dialing telephone numbers or using money-management software. She also reported experiencing dizziness and lightheadedness in crowds or when walking fast.

In August 2003, Dr. Bruce Van Dyne, a psychiatrist and neurologist, conducted an independent medical examination of Spicer. In his report, Dr. Van Dyne concluded:

> Based upon my review of the available medical records and the present examination, it is my opinion that Ms. Spicer is not functionally disabled from full-time gainful employment. Although she does have an incomplete left homonymous visual field deficit that is primarily an inferior quadratic defect with some extension into the superior quadrant, she has preserved central vision and is also fully aware of her visual field deficit. Her occupational therapy and vocational assessments at Courage Center also clearly document that she has intact reading capabilities as well as intact typing and ten-key data entry capabilities that were assessed as 98 percent accurate. Although she reports fatigue when working at the computer, there does not appear to be any specific physical basis for her reported fatigue and I would not expect her demonstrated

> visual field deficit to necessarily accentuate her feeling of fatigue which may be more related to her diagnosed depression.
>
> Based upon my review of the available occupational therapy and vocational evaluations from the Courage Center, it doesn't appear that she has any specific physical disability that would preclude her from full-time employment. Her neurologic status is stable and, except for the demonstrated left visual field deficit, she also has no other neurologic deficit that would prevent her from full-time unrestricted employment. Although she has apparently been cleared by the Courage Center for driving, her visual field deficit would seem to preclude her from any type of commercial driving and may also be a relative contraindication to work around dangerous equipment but would not otherwise be a contraindication to employment in a relatively sedentary office position.

Dr. Van Dyne also completed a Physical Capacities Evaluation Form. In it, he reported that, in an eight-hour work day, Spicer could sit eight hours, stand six hours, walk six hours, and drive two hours. He also assessed her ability to perform tasks, including climbing, balancing, stooping, reaching, handling, fingering, and feeling. He also stated she should not work near dangerous machinery and should not operate a commercial vehicle.

After receiving Dr. Van Dyne's report, Hartford asked Drs. Showalter and Mack to comment on it. The record does not contain a response from Dr. Showalter. In November 2003, Dr. Mack commented on Dr. Van Dyne's report as follows:

> I have read the report of your neurological consultant, [Dr. Van Dyne], and I admire [his] thoroughness. I have some questions about his conclusion. He notes that by her Courage Center evaluation she has intact reading capabilities and intact typing and 10-key data entry capacities that were assessed as 98% accurate. However, I note that the entry speed seems limited, 40 words per minute and 32 words per minute respectively. Although I am not a transcriptionist, I suspect that this data entry is below the level required of most people pursuing that task. I therefore request that you compare her abilities with job description requirements for that type of work. There is an additional factor which cannot be tested. Ms. Spicer has had a stroke and she reports fatigue and distractability. This is a common symptom after a stroke and one that cannot be tested in a formal situation. It is my opinion that her limited vision, her impaired computer skills, and her fatigability all greatly lessen her employability in fields for which she is trained. I therefore consider her to be disabled and ask that you reconsider your decision.

7

After obtaining Dr. Mack's November 2003 comments, Hartford asked Dr. William Sniger, who specializes in physical medicine and rehabilitation, to determine Spicer's functional capacity to perform any type of work.  Dr. Sniger reviewed Spicer's medical records and spoke with Drs. Mack and Showalter.  In a report dated December 27, 2003, Dr. Sniger concluded: "Based upon my review of the medical records and my conversations with [Spicer's] physicians, it is my opinion that [Spicer] has the functional capacity to perform sedentary work on a full-time basis."

While soliciting responses to Dr. Van Dyne's independent medical examination of Spicer, Hartford obtained an employability analysis report.  Hartford based the report on the Occupation Access System, which cross-references an individual's qualifications with more than 12,000 occupations classified by the United States Department of Labor in the 1991 Dictionary of Occupation Titles.  The report, dated October 31, 2003, recognized Spicer's functional capabilities as identified by Dr. Van Dyne in the Physical Capacities Evaluation Form.  The report identified five occupations that would accommodate Spicer's physical limitations, match her education, training, and work history, and satisfy the earnings-potential requirement of the Policy's definition of "Any Occupation."  Specifically, it identified Administrative Assistant, Office Manager, Shipping-Order Clerk, and Maintenance Service Dispatcher as matches for Spicer's skills.

In February 2004, Spicer started to work at an assisted-living facility as a care attendant. Pay stubs through the time of Spicer's appeal of Hartford's decision to terminate her LTD benefits reveal that she worked 30 hours during the two weeks ending on February 29; 53.75 hours during the two weeks ending on March 14; 48 hours during the two weeks ending on March 28; 48 hours during the two weeks ending on April 11; 49.5 hours during the two weeks ending on April 25; 51 hours during the two weeks ending on May 9; 51.5 hours during the two

8

weeks ending on May 23; 52.5 hours during the two weeks ending on June 6; and 48.5 hours during the two weeks ending on June 20.

In support of her appeal from Hartford's decision to terminate her benefits, Spicer submitted a letter dated June 30, 2004, from Dr. Mack. After describing Spicer's visual impairment, Dr. Mack opined that she could not work more than twenty-four hours per week:

> It is my opinion that because of Ms. Spicer's right occipital infarction she cannot perform complex visual tasks. She cannot do prolonged keyboard work or reading. This adversely affects essentially every employment for which she might be capable. Ms. Spicer is presently employed at an assisted living facility and works 24 hours per day [sic] in six-hour shifts. She works no more than three days in a row because of fatigue. The 24-hours is all that she can handle as her fatigue and error rate increase with attempted work beyond these hours. I feel emphatically that Ms. Spicer cannot work more than 24 hours per week on a consistent basis. The stroke has affected not only her vision but also her processing speed. Visual tasks are a high percentage of most employment particularly clerical employment. Ms. Spicer does not have the stamina or the processing ability to work for more than 24 hours per week.

After receiving Spicer's appeal, Hartford asked Dr. Alan Weingarden, a neuro-ophthalmologist, to conduct an independent medical evaluation of Spicer. On October 21, 2004, Dr. Weingarden examined Spicer and provided the following impressions:

> It is my impression that [Spicer] has a visual field defect that is permanent, likely related to the migraine and stroke phenomenon that she suffered. Because of her abnormal opticokinetic nystagmus testing, I can confirm that she has a great deal of difficulty watching objects coming from the left visual field into the right and then going back to the left field to pick up another object. This would be consistent with the location of her visual field defect. Therefore, I can state to a degree of medical certainty that Ms. Spicer has a great deal of difficulty functioning in the capacity of reading, using a computer, and other keyboard exercises that would require her turning from one side to the other. This would slow her up considerably in doing those job performances, give her considerable difficulties and frustration, and no doubt lead to some fatigability as well.

With regard to Dr. Mack's opinion that Spicer could not work more than twenty-four hours per week, Dr. Weingarden stated:

> I could see Ms. Spicer having a great deal of frustration and difficulty working, especially at office-oriented tasks and then getting very tired as a result of trying

> to figure out what to do. As far as other tasks go at the nursing home, I could not state that the visual field difficulty would have an impact on her assisting patients and just helping them move around, and I would have to defer that particular fatigability issue to her neurologist, but I can certainly say that she would have some difficulty maneuvering consistent with her visual field defect and consistent with her frustration in trying to find things.

Hartford later asked Dr. Weingarden to clarify whether Spicer was capable of full-time employment in occupations that did not require frequent visual acuity. On November 18, 2004, Dr. Weingarden wrote:

> If Ms. Spicer can be placed in a work situation that she can visually handle, then full time work from an eye standpoint would be fine. She has some difficulty negotiating in space and orienting herself and if the demands of the jobs were such that she was not expected to hurry about and be in need of rapid movements, I suspect she could handle that at the nursing home. Regarding the fatigability issue, I think that is still a neurology, not an ophthalmology issue. I would have to, again, defer that to her neurologist. Regarding keeping up on dictations, typing, or computer work, I think she would find this almost impossible given her visual field deficit, but in terms of working at a nursing home in a pace that was slow enough that she could handle, I think a full time job would be all right from a visual standpoint.

On December 2, 2004, Hartford conducted another employability analysis of Spicer. The analysis acknowledged the limitations placed on Spicer by Dr. Weingarden and characterized her ability to engage in "Near Acuity" as "Occasionally." The analysis identified three occupations that Spicer could perform given her physical limitations, qualifications, and experience, and that would satisfy the earnings-potential requirement of the Policy's definition of "Any Occupation": Animal-Hospital Clerk, Animal Shelter Clerk, and Case Aide.

The next day, Hartford issued its final denial of Spicer's claim. After summarizing the contents of the claim file, Hartford acknowledged that Spicer could not perform her previous position at North Memorial or her current position at the assisted-living facility on a full-time basis because of the positions' visual requirements. Hartford asserted, however, that "[t]he

10

medical and vocational evidence . . . do not support that Ms. Spicer is Disabled from Any Occupation as defined in the Policy."

## II.   DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A participant in an ERISA plan may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Typically, a court reviews de novo a denial of benefits challenged under that section. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, when a plan gives discretionary authority to the plan administrator or reviewing committee to determine eligibility for benefits or to construe the terms of the plan, a court reviews the decision to deny benefits for an abuse of discretion. *Id*. Here, the Policy states: "We [Hartford] have full discretion and authority to determine eligibility

for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." This language invokes the abuse-of-discretion standard. *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 1000 (8th Cir. 2005) (en banc).

Notwithstanding the Policy's grant of discretionary authority to Hartford, Spicer asserts that the Court should review Hartford's decision with less deference because Hartford labored under a "patent conflict of interest" by acting as both insurer and plan administrator. According to Spicer, *Armstrong v. Aetna Life Insurance Co.*, 128 F.3d 1263 (8th Cir. 1997), requires the Court to review de novo Hartford's denial of her claim. In *Armstrong*, the Eighth Circuit subjected an insurer's denial of benefits to de novo review despite language in the health plan that conferred discretion on the insurer, which also acted as plan administrator. 128 F.3d at 1264-65. The Eighth Circuit held that "the circumstances of [the] case" required de novo review. *Id.* at 1265. Those circumstances included the provision of incentives and bonuses by the insurer to its claim reviewers based on criteria that included "claims savings." *Id.* In this case, Spicer does not assert that Hartford, in its role as insurer and administrator, offered incentives to its claim reviewers to deny claims. Thus, Spicer's reliance on *Armstrong* is misplaced. *See Davolt v. Executive Comm. of O'Reilly Auto.*, 206 F.3d 806, 809 (8th Cir. 2000) (stating that *Armstrong* "did not . . . create a blanket rule mandating de novo review in all cases where the insurer of a health benefits plan is also the plan administrator"). Without more, Spicer's assertion that Hartford's decision was tainted by a "patent conflict of interest" is insufficient to trigger a less deferential standard of review. *See Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 677-80 (8th Cir. 2005) ("Torres presented no evidence that UNUM denied his claim because it was financially advantageous for it to do so. Accordingly, he has not shown that UNUM's financial conflict of interest had a sufficient connection to the decision reached to

trigger a departure from the abuse of discretion standard."). Accordingly, the Court reviews Hartford's denial of Spicer's claim for an abuse of discretion.[1]

Under the abuse-of-discretion standard, a court must uphold the plan administrator's decision if it was "reasonable" or supported by "substantial evidence." *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004). Substantial evidence is more than a scintilla but less than a preponderance. *Leonard v. Sw. Bell Corp. Disability Income Plan*, 341 F.3d 696, 701 (8th Cir. 2003). Based only on the evidence that was before the plan administrator at the time the decision was made, a court focuses on whether a "reasonable person *could* have reached a similar decision . . . not that a reasonable person *would* have reached that decision." *Phillips-Foster v. UNUM Life Ins. Co. of Am.*, 302 F.3d 785, 794 (8th Cir. 2002) (quotations omitted).

In this case, Hartford denied Spicer's claim after concluding that she did not meet the Policy's definition of Disability as of July 21, 2003. As detailed above, Spicer must be incapable of "performing one or more of the Essential Duties of Any Occupation" to be disabled. The parties do not dispute that the ability to work full time is an Essential Duty. They disagree as to whether Spicer is capable of full-time employment. Spicer maintains she is incapable of

---

[1] Citing *Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005), Spicer asserts that Hartford should have provided her an opportunity to review and respond to Dr. Weingarden's reports before issuing its final decision. Spicer does not ask the Court to remand the case to Hartford with instructions to reopen the administrative record to permit her to respond to Dr. Weingarden's reports, the remedy *Abram* provides for a plan administrator's failure to provide a full and fair review. *Id.* at 885-86. Nor does Spicer argue that Hartford's alleged failure to provide a full and fair review is a serious procedural irregularity that warrants less deferential review. *See Torres*, 405 F.3d at 679-80. Finally, the Court notes that Hartford sent Dr. Weingarden's reports to Dr. Mack, that Hartford asked Dr. Mack to respond to the reports, and that Spicer's counsel declined to authorize Dr. Mack to submit to Hartford's interrogation. Under these circumstances, the Court reviews Hartford's denial of Spicer's claim for abuse of discretion.

working more than twenty-four hours per week. Hartford contends that Spicer is capable of full-time employment.

The Court's review of the record reveals substantial evidence that Spicer is capable of full-time employment. For instance, after conducting an independent medical examination of Spicer, Dr. Weingarden concluded that she was capable of full-time employment notwithstanding her visual impairment. He deferred to Spicer's neurologist the issue of whether Spicer's fatigue prevented her from full-time employment. The record contains conflicting medical opinions as to whether Spicer has a neurologic defect that precludes full-time employment. On June 30, 2004, Dr. Mack stated "emphatically" that Spicer could not work more than twenty-four hours per week. Notwithstanding Dr. Mack's assertion, Spicer's pay stubs from March to June 2004 indicate that she frequently exceeded the limit declared by Dr. Mack, albeit not by much. In any case, after conducting an independent medical examination of Spicer, Dr. Van Dyne reached a conclusion that differs from that of Dr. Mack. In August 2003, Dr. Van Dyne concluded that Spicer had neither a "specific physical disability" nor a "neurologic deficit" that would prevent her from engaging in full-time employment. Moreover, after reviewing Spicer's medical records and speaking with Drs. Mack and Showalter, Dr. Sniger concluded that Spicer "has the functional capacity to perform sedentary work on a full-time basis." On this record, Hartford could reasonably conclude that Spicer is capable of full-time employment. *See Hunt v. Metro. Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005) (per curiam) ("In view of the conflicting opinions offered by Hunt's treating physician and the reviewing physicians, MetLife's decision to deny Hunt's claim based on the opinions of [the reviewing physicians] was not an abuse of discretion.").

The Court now considers whether Hartford could reasonably conclude that Spicer is capable of full-time employment in "Any Occupation." Hartford conducted two employability analyses of Spicer. The first acknowledged Spicer's physical limitations identified by Dr. Van Dyne. It identified five occupations that Spicer could perform given her physical limitations, education, training, and work history, and that satisfy the earnings-potential requirement of the Policy's definition of "Any Occupation." The second analysis recognized further limitations on Spicer's physical capabilities. It identified three occupations that Spicer could perform given her physical limitations, education, training, and work history, and that satisfy the earnings-potential requirement of the Policy's definition of "Any Occupation." The Court recognizes that the responsibilities of the positions identified in the second employability analysis require her to read or drive. The second employability analysis accounts for Spicer's visual impairment by characterizing her ability to engage in "Near Acuity" as "Occasionally." Although Dr. Van Dyne stated that Spicer should not operate a commercial vehicle, he did not state that she was incapable of any driving. In fact, he stated she could drive for two hours in an eight-hour work day, and Spicer has a license to drive. Accordingly, Hartford could reasonably rely on the employability analyses, in addition to the medical opinions summarized above, in concluding that Spicer is capable of full-time employment in "Any Occupation."

In short, Hartford's decision to terminate Spicer's LTD benefits is supported by substantial evidence. The Court therefore grants Hartford's motion and denies Spicer's motion.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Hartford's Motion for Summary Judgment [Docket No. 19] is GRANTED.

2. Spicer's Motion for Summary Judgment [Docket No 23] is DENIED.

3. This case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 6, 2006

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge
